UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

CONGREGATION ADAS YEREIM, YESHIVA
BNEI SHIMON YISROEL, MARCY HOUSING
TENANTS ASSOCIATION, and HYGRADE
GLOVE & SAFETY COMPANY,

           Plaintiffs,

           - against -

THE CITY OF NEW YORK, THE NEW YORK
CITY DEPARTMENT OF SANITATION, and
THE NEW YORK CITY DEPARTMENT OF
CITY PLANNING,

           Defendants.

-----------------------------------------------------------------X

**MEMORANDUM AND ORDER**

07-cv-01457-ENV-RER

**VITALIANO, D.J.**

Plaintiffs Congregation Adas Yereim (the "Congregation"), Yeshiva Bnei Shimon Yisroel ("Yeshiva BSY"), Marcy Housing Tenants Association (the "Tenants Association"), and Hygrade Glove & Safety Company ("Hygrade") bring this action against defendants the New York City Department of Sanitation ("DOS"), the New York City Department of City Planning ("DCP"), and the City of New York,[1] under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. ("RLUIPA"), and 42 U.S.C. § 1983. Plaintiffs' complaint arises from actions taken by the defendants with respect to two adjoining parcels of real property, bounded by Warsoff Place, Park Avenue, Nostrand Avenue, and Flushing Avenue, in Brooklyn, New York (the "project site"). The Congregation owned the northern of these two

---

[1] Strictly speaking, there is only one defendant amenable to suit: the City of New York. All of the other defendants are merely departments of the City and have no independent corporate or legal identity. See N.Y. City Charter, Ch. 17, § 396 ("[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law"); Echevarria v. Dep't of Corr. Servs., 48 F. Supp. 2d 388, 391 (S.D.N.Y. 1999).

properties, located at 48 Warsoff Place (the "Warsoff property"), and hoped to construct on it a religious complex. The defendants, however, determined to put the location to a different use, as the site for an as yet to be constructed sanitation garage. To that end, over the objections of plaintiffs, DOS sought and ultimately obtained title to the project site pursuant to the City's Uniform Land Use Review Procedure, N.Y. City Charter, § 197-c ("ULURP"), and a subsequent state court vesting proceeding.

Plaintiffs now sue for declaratory and injunctive relief to undo this turn of events, and for damages. They allege that (1) defendants' opposition to the Congregation's plans to build the religious complex, and the various actions they took to secure title to the Warsoff property, violated the Congregation's rights under RLUIPA; and (2) defendants failed, at two stages during the acquisition process, to provide plaintiffs with sufficient notice of their actions, in violation of their due process rights. Presently before the Court is defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion is granted and the complaint is dismissed.

## I. BACKGROUND

The Congregation and Yeshiva BSY are religious organizations whose members practice the Jewish faith. The Congregation owned the Warsoff property, while Yeshiva BSY operates a religious school on Warsoff Place approximately 25-30 feet from the project site. Hygrade is an industrial safety products company located within one block of the project site, and the Tenants Association is an organization representing the residential tenants of the Marcy Houses, a New York City Housing Authority apartment complex that borders Nostrand Avenue, about 400 feet from the project site.

A. <u>Plaintiffs' Allegations</u>

At all times relevant to this proceeding, the Warsoff property was an undeveloped parcel of real estate zoned for manufacturing use with the street address of 48 Warsoff Place. During the time the Congregation owned the property, it sought to build a religious complex upon it, including a *yeshiva*, that is, a religious school, and residential facilities. In furtherance of its objectives, sometime prior to February 2001, the Congregation applied to the New York City Board of Standards and Appeals ("BSA") for a special use permit ("SUP") to allow it to construct the proposed buildings. At the same time, DOS proceeded with its own plans for the project site. On June 20, 2000, DOS and the Department of Citywide Administrative Services, acting pursuant to ULURP, filed an application with DCP for site selection and acquisition of the project site for use as a sanitation garage serving Brooklyn's Community District 3 -- the district in which the project site is located. Because the proposed project was subject to state and city environmental review -- under the New York State Environmental Quality Review Act and the New York City Environmental Quality Review, respectively -- DOS began preparing an Environmental Assessment Statement ("EAS") for the project and hired an outside consulting firm to study the proposed garage's environmental impact.

Plaintiffs allege that as both development efforts moved forward, defendants took action to ensure that their intended use for the project site would prevail. On April 23, 2001, DOS sent a letter to BSA objecting to the Congregation's request for a SUP on the ground that the proposed yeshiva would only serve Jewish children living outside of Community District 3. This objection, plaintiffs contend, lacked merit and evinced an improper disregard for the Congregation's judgment concerning the development of its own land.[2]

---

[2] In this vein, plaintiffs allege that DOS's objection is inconsistent with the position taken by BSA "and/or" DCP when Yeshiva BSY applied for a SUP to build its Warsoff Place yeshiva several years earlier. (Compl. ¶ 18.) In agreeing to issue Yeshiva BSY's SUP in that instance, plaintiffs assert that

3

In July of 2001, DOS released its EAS for the garage project. The report concluded that the garage would not cause a significant adverse impact on the environment and, accordingly, on July 20, 2001, DOS issued a Negative Declaration terminating the environmental review process.

With the environmental review concluded, DCP certified DOS's application as complete and, pursuant to article 3 of ULURP, referred the matter to Brooklyn Community Board 3 (the "community board") and the Brooklyn Borough President. On September 10, 2001, the community board held a meeting about the proposed project (the "September 10 hearing"). Though the community board was required to ensure that the hearing be open and public, plaintiffs suggest that the board convened in "less formal" circumstances and allege that the Tenants Association was not provided sufficient notice of the event. (Compl. ¶ 32.) Following a DOS presentation and discussion, the community board adopted a resolution recommending the approval of the sanitation garage proposal. Plaintiffs contend that this vote was motivated by anti-Semitism and, in any event, constituted a *de facto* denial of the Congregation's still pending SUP application. On November 14, 2001, the Borough President also issued a recommendation that the DOS application be approved, subject to several conditions.

The approval process quickly advanced. A week after the Borough President's recommendation, on November 21, 2001, the City Planning Commission ("CPC") held a public hearing concerning the garage proposal. CPC took comment from several individuals, including representatives of the plaintiffs and others in opposition to the project. In response to the criticism voiced by project opponents, CPC's chairman committed, say plaintiffs, to visiting the project site before CPC would make any ultimate decision on the proposal. Notwithstanding this alleged promise, however, plaintiffs assert that no one from CPC ever made such a visit and, by resolution dated December 5, 2001, CPC formally approved the DOS project.

---

"[BSA] and/or [DCP] acknowledged the fact that Yeshiva BSY drew its student population from different geographic areas" outside of Community District 3. (Id.)

On February 21, 2002, as a result, plaintiffs allege, of defendants' efforts to build the sanitation garage on the project site, the Congregation withdrew its still pending SUP application.

B. **Prior Proceedings**

On October 10, 2003, the City, acting pursuant to New York Eminent Domain Procedure Law ("EDPL") § 402(B), commenced a vesting proceeding in Supreme Court, Kings County, seeking to acquire title to the project site (the "vesting proceeding"). The Congregation, as owner of the Warsoff property, along with the owner of the second parcel of land that comprises the remainder of the project site (together, the "condemnees"), filed answers to the City's petition asserting a number of affirmative defenses to the proposed taking. In response, the City moved to strike the answers and reiterated its request for a judgment transferring title.

While the vesting proceeding was pending, on March 26, 2004, several members of the local community, including plaintiffs Yeshiva BSY, the Tenants Association, and Hygrade, initiated a related action against the City in Supreme Court, requesting, *inter alia*, a permanent injunction barring the City from condemning the project site and constructing the proposed sanitation garage (the "community action"). The City moved to dismiss and Supreme Court consolidated the community action with the vesting proceeding for the purpose of rendering a decision on the outstanding motions.

On November 10, 2004, Supreme Court issued a comprehensive opinion disposing of the motions in the consolidated cases. In the vesting proceeding, the court granted the City's motion to strike the condemnees' answers and granted its petition to acquire the project site; in the community action, the court granted the City's motion to dismiss.[3] In re City of New York, 798 N.Y.S.2d 708, 5 Misc. 3d 1014(A), 2004 WL 2590582 (N.Y. Sup. Ct. 2004). The Congregation

---

[3] The decision was implemented by orders entered on December 1, 2004 (as to the vesting proceeding) and January 5, 2005 (as to the community action).

5

and the plaintiffs-parties to the community action appealed, but, on September 26, 2006, the Appellate Division, Second Department affirmed. In re Sanitation Garage Brooklyn Districts 3 and 3A, 32 A.D.3d 1031, 822 N.Y.S.2d 97 (2d Dep't 2006). The losing parties then sought leave to appeal from the Court of Appeals, but leave was denied on December 21, 2006. In re Sanitation Garage Brooklyn Districts 3 and 3A, 7 N.Y.3d 921, 827 N.Y.S.2d 686, 860 N.E.2d 988 (2006).

On March 15, 2007, plaintiffs commenced the instant action by filing a complaint in federal court in the Southern District of New York. By order dated March 22, 2007, the action was transferred to this Court, where the defendants have moved to dismiss.

## II. DISCUSSION

### A. Standard of Review for Motion to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." This rule does not compel a litigant to supply "detailed factual allegations" in support of his claims for relief, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555); see also In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir. 2007). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 555 U.S. at 557).

A court considering a motion to dismiss under Rule 12(b)(6) must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co., 517

6

F.3d 104, 115 (2d Cir. 2008). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 555 U.S. at 570). This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (internal quotations omitted); see Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (interpreting Twombly to require a "plausibility standard" that "obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible") (emphasis omitted), rev'd on other grounds, 129 S. Ct. 1937 (2009).

In deciding a Rule 12(b)(6) motion, a court may consider, in addition to the pleading itself, documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit, and matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

B. **The RLUIPA Claim**

Plaintiffs assert that defendants' opposition to the Congregation's plans to build a religious complex and the various actions they took to secure title to the Warsoff property breached the Congregation's rights under RLUIPA. The claim, viewed in its most favorable light, targets three categories of alleged misconduct, each of which, plaintiffs argue, amounts to a RLUIPA violation: (1) defendants' actions with respect to the Congregation's SUP application -- specifically, DOS's April 2001 opposition to the then pending application and its effective denial at the hands of the community board and CPC in late 2001; (2) the project site acquisition process under article 2 of EDPL and ULURP -- specifically, defendants' actions beginning with DOS's June 2000 application for site selection and acquisition of the project site, including the environmental review process, the community board's September 10, 2001 hearing and vote, and

7

concluding with CPC's final approval of the garage project in December 2001; and (3) the project site acquisition process pursuant to article 4 of EDPL -- specifically, the City's October 2003 commencement of the vesting proceeding and Supreme Court's decision, later affirmed, ordering the formal transfer of the Warsoff property's title from the Congregation to the City.[4]

1. **Defendants' Arguments Based on the Rooker-Feldman Doctrine**

Defendants argue, as a threshold matter, that the Court is without jurisdiction to hear plaintiffs' RLUIPA claim because of the Rooker-Feldman doctrine. The doctrine, named for the Supreme Court's decisions in Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983), is animated by the "clear principle that federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005). The doctrine therefore bars, in certain circumstances, a plaintiff from pursuing federal litigation following the disposition of a related state action. Id.

Rooker-Feldman once operated broadly in this circuit and elsewhere. However, recent decisions by the Supreme Court and the Second Circuit have dramatically reined in its applicability, confining the doctrine to the kind of cases from which it originated: "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those

---

[4] The New York Court of Appeals has held that, under EDPL, a government entity's acquisition of property occurs in two distinct steps:

> First, under EDPL article 2, the condemnor must make a determination to condemn the property either by using the hearing and findings procedures of EDPL §§ 203 and 204 or by following an alternative procedure [such as ULURP] permitted by EDPL § 206. Second, pursuant to EDPL article 4, the condemnor must seek the transfer of title to the property by commencing a judicial proceeding known as a vesting proceeding.

In re City of New York, 6 N.Y.3d 540, 543, 814 N.Y.S.2d 592, 593, 847 N.E.2d 1166, 1167 (2006). For this reason, the Court views plaintiffs' RLUIPA allegations here, which aim at conduct that allegedly took place at both stages of the process, as forming multiple independent avenues of relief.

judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 283-84 (2005); McKithen v. Brown, 481 F.3d 89, 96-97 (2d Cir. 2007); Hoblock, 422 F.3d at 85. Accordingly, four requirements now must be met if a district court is to be divested of subject matter jurisdiction pursuant to Rooker-Feldman: (1) the federal court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries caused by a state court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state court judgment must have been rendered before the district court proceeding commenced. Hoblock, 422 F.3d at 85. The first and fourth requirements are procedural, while the second and third are substantive. Id.

It is uncontested that plaintiffs in this action are the same parties who litigated and lost the vesting proceeding and the community action in state court, satisfying the first requirement. So too, is the fourth requirement met: this suit commenced after a final decision was rendered in the state courts. Plaintiffs' argument to the contrary -- that state court litigation continues, because Supreme Court has not yet determined the amount the condemnees must be compensated for the taking -- is unpersuasive. Title to the Warsoff property has vested with the City on Supreme Court's order. N.Y. E.D.P.L. § 402(B)(5). Plaintiffs exhausted their state appeals and lost. The order therefore is final, the issues it resolved are finally decided, and were so on the date this action began. The procedural requirements of Rooker-Feldman thus are satisfied. See generally Green v. Mattingly, 585 F.3d 97, 102 (2d Cir. 2009).

As to the doctrine's substantive requirements, defendants argue that the factors are met because the RLUIPA claim is, in effect, an impermissible appeal from state court. By the commencement of this action, defendants contend, plaintiffs are merely attempting to re-litigate the state court actions in order to undo the damage caused them by Supreme Court's adverse judgment. Plaintiffs, in contrast, argue that their injuries were not caused by the state court's

ruling, but rather, by defendants themselves, and existed prior to that judgment. Further, they assert that because the RLUIPA claim was not presented to the state court and, therefore, Supreme Court did not adjudicate it, this action premised on RLUIPA does not invite review and rejection of that court's decision.

As an initial matter, the fact that the RLUIPA claim was not part of the state court actions does not, itself, shut the door to Rooker-Feldman. The Second Circuit has made clear that "[j]ust presenting in federal court a legal theory not raised in state court . . . cannot insulate a federal plaintiff's suit" from the doctrine's bar. Hoblock, 422 F.3d at 86.[5] The key inquiry concerns causation: if the federal plaintiff complains of injury *caused by* a state court judgment and seeks to have that judgment reversed, Rooker-Feldman will apply. Id.

Of course, whether a state court judgment is, itself, the cause or source of a plaintiff's injury, as opposed to simply a setback along the journey leading from injury to redress, is not always clear. In seeking to separate these classes of cases, the former, within the ambit of Rooker-Feldman and the latter, not, the Second Circuit has explained that "a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." Id. at 88. Put another way, in a fashion that highlights the necessary causal component of the analysis, "a party is not complaining of an injury 'caused by' a state-court judgment when the exact injury of which the party complains in federal court existed *prior* in time to the state-court proceedings, and so could not have been 'caused by' those proceedings." McKithen, 481 F.3d at 98.[6]

---

[5] On the other side of the same coin, a plaintiff whose federal action is similar in substance to his prior state case, and who "seeks in federal court a result opposed to the one he achieved in state court does not, for that reason alone, run afoul of Rooker-Feldman." Hoblock, 422 F.3d at 87.

[6] In order to illustrate the application of these rules, the Hoblock Court provided two examples. In the first, the Court postulated a scenario in which a state court relying on state law terminated a father's

10

Here, plaintiffs' RLUIPA claim is multifaceted. As noted, plaintiffs allege that they are entitled to relief under that statute for three reasons, first, because defendants opposed and effectively defeated the Congregation's SUP application in 2001; second, because of defendants' efforts to obtain CPC approval for the garage project in 2000-2001; and third, because the City took title to the Warsoff property from the Congregation, as a result of the vesting proceeding commenced in 2003. In line with the Circuit's guidance, the Court finds it plain that neither of the first two prongs of plaintiffs' RLUIPA claim is barred by Rooker-Feldman. As plaintiffs correctly note, the injuries they allege they suffered under the first two theories of relief -- the denial of the SUP and CPC's approval of the garage project -- stem from actions allegedly taken by defendants of their own accord and not pursuant to court order. Critically, neither injury can be said to be *caused by* the state court proceedings, which did not commence until *after* these harms accrued. See McKithen, 481 F.3d at 98; Hoblock, 422 F.3d at 88. The Court therefore has subject matter jurisdiction to adjudicate these aspects of plaintiffs' RLUIPA claim.

The remaining branch, which aims at the second phase of the eminent domain procedure, the vesting proceeding, see In re City of New York, 6 N.Y.3d at 543, 814 N.Y.S.2d at 593, 847 N.E.2d at 1167, is another matter. To understand why, a brief review of New York EDPL is useful. Under EDPL, before the City may take title to a property for public use, it "shall obtain

---

parental rights and ordered the state to take custody of his son. If the father then were to sue in federal court, under federal law, seeking the return of his son, he would be complaining of an injury -- the termination of his parental rights -- caused by the state judgment. And this, he could not do. Indeed, Rooker-Feldman even would bar a suit against the state employees who actually removed the child from the parent's physical custody, noted the Court, because those individuals would be acting pursuant to the state court's order. Hoblock, 422 F.3d at 87.

In contrast, in the second example, the Circuit envisioned a plaintiff who unsuccessfully sued his employer in state court for employment discrimination under federal and state law. If the plaintiff were to bring the same action in federal court, he would be seeking a decision from that court denying the state judge's conclusion that the employer is not liable. But, as the Court pointed out, "he will not be alleging injury from the state judgment. Instead, he will be alleging injury based on the employer's discrimination," a harm that, crucially, was present prior to the state court proceedings. Id. at 87-88; McKithen, 481 F.3d at 98.

11

an order to acquire such property and for permission to file [an acquisition] map" by filing a petition in Supreme Court. N.Y. E.D.P.L. § 402(B). Such a filing commences what is known as a vesting proceeding. If, upon review during that proceeding, the state court determines that the petition is valid, "the court shall direct the immediate filing and entry of the order granting the petition." N.Y. E.D.P.L. § 402(B)(5). The City then "shall" file and enter that order together with the acquisition map (and any bond or undertaking that may be required) in the office of the local county clerk or register. N.Y. E.D.P.L. § 402(B)(5). With the filing of the court's order and the acquisition map, "the acquisition of the property in such map shall be complete and title to such property shall then be vested" in the City. N.Y. E.D.P.L. § 402(B)(5).

Plaintiffs' objection to the outcome of this process occupies the narrow ground still controlled by Rooker-Feldman. In this component of their claim, plaintiffs endeavor to dissolve Supreme Court's order and undo a harm -- the vesting of the Warsoff property with the City -- which did not and could not exist prior to the entry of the state court order. Such a causal relationship between the state judgment and the harm alleged matches that required by Second Circuit precedent. McKithen, 481 F.3d at 98. Just as a father's federal court challenge to the termination of his parental rights by a state court order will run aground on the shoals of Rooker-Feldman, see Hoblock, 422 F.3d at 87; Green, 585 F.3d at 102-03, so too, does plaintiffs' challenge to Supreme Court's order terminating the Congregation's rights to the Warsoff property here.

It matters not that it was the City's conduct, in filing the condemnation petition, that commenced the vesting proceeding resulting in the termination of the Congregation's property interest. Nary a court order is conceived without some impetus from litigants, whether it be a petition by the City's Administration for Children's Services ("ACS"), in the case of a judgment terminating parental rights, or, in a vesting proceeding, a petition by other City agencies such as

those involved in this matter. That Supreme Court agreed with the position taken by the City in this case -- that its petition was valid -- does not place the harm generated by that determination beyond Rooker-Feldman's reach.[7] Accordingly, the Court is without subject matter jurisdiction to entertain plaintiffs' RLUIPA claim, inasmuch as it seeks redress from a harm caused the Congregation by the City's taking of the Warsoff property in the vesting proceeding.

2.     **RLUIPA as Applied to Eminent Domain Proceedings**

Even if plaintiffs were correct, however, and Rooker-Feldman did not bar any aspect of their complaint, the Court still would dismiss the portion of their RLUIPA claim that flows from

---

[7] It is on this basis that the Court respectfully parts ways with the decision in Brody v. Village of Port Chester, No. 00-CV-7481, 2007 WL 704002 (S.D.N.Y. Mar. 7, 2007). Brody, decided before the Second Circuit's rulings in McKithen and Green, declined to apply Rooker-Feldman to a plaintiff's due process claim challenging a municipal defendant's efforts to acquire his property through eminent domain. Brody, 2007 WL 704002, at *5. Judge Baer based his rejection of Rooker-Feldman in that case on his interpretation of Hoblock's causation requirement. Judge Baer noted that in Hoblock, the Second Circuit found causation between judgment and harm -- and thus, found the doctrine to apply -- where the party seeking to use Rooker-Feldman as a shield had not sought, in state court, the result ultimately ordered by the state judge. Id. at *5 n.10. From these facts, Judge Baer reasoned that Hoblock requires a stringent form of "but for" causation between judgment and harm, such that any effort by a party to bring about the state judgment -- by, for example, requesting that the state court order such relief -- would constitute a proximate cause of the resulting injury and defeat the doctrine. Id. This "but for" causation was not present in Brody -- nor here -- because the municipality initiated the proceedings that led to the court-ordered taking. Id.

In this Court's view, Brody reads Hoblock too narrowly, certainly as it applies to a case, like this one, which challenges, *inter alia*, the taking itself (as opposed to the notice given to effectuate it -- the issue in Brody). The Court finds that the form of "but for" causation demanded in Brody is incompatible with the very exemplar provided by the Second Circuit to illustrate the doctrine's applicability: a state court's termination of a father's parental rights. As the Circuit's example makes clear, application of the doctrine cannot hinge on the parties' litigation positions in state court, for indeed, in the ordinary course, a court order terminating parental rights issues precisely because a government agency, ACS, has requested it. See, e.g., Green, 585 F.3d at 99-100, 102. The Court concludes that Hoblock is better understood as McKithen read it -- to foreclose Rooker-Feldman where the injury in question existed prior in time to the state court proceedings, but to apply it where the harm accrued after and because of the state judgment. McKithen, 481 F.3d at 98. Here, the harm at issue in the third branch of plaintiffs' RLUIPA claim is the taking of the Warsoff property itself, an injury that did not occur until after the court ordered it and, by operation of law, could not have taken place before. N.Y. E.D.P.L. § 402(B)(5). Any decision of this Court granting the Congregation the return of the Warsoff property, like any federal court order returning a child to a father whose parental rights had been terminated by the state courts, necessarily would entail the review and rejection of a state judgment. This, the Court cannot do.

the harm caused by the taking of the Warsoff property because RLUIPA does not apply to eminent domain proceedings.

The plain language of RLUIPA makes clear that the statute operates only when a state or local government attempts to "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person." 42 U.S.C. § 2000cc(a)(1); see Westchester Day Sch. v. Village of Mamaroneck, 504 F.3d 338, 347 (2d Cir. 2007). A "land use regulation", in turn, is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land." 42 U.S.C. § 2000cc-5. Accordingly, the government implements a "land use regulation" within the meaning of RLUIPA "only when it acts pursuant to a 'zoning or landmarking law' that limits the manner in which a claimant may develop or use property in which the claimant has an interest." Prater v. City of Burnside, 289 F.3d 417, 434 (6th Cir. 2002); Vision Church v. Village of Long Grove, 468 F.3d 975, 998 (7th Cir. 2006); San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1036 (9th Cir. 2004).

The threshold question, then, is whether the City acted pursuant to a zoning or landmarking law when it exercised its power of eminent domain and took title to the Warsoff property. Working backwards, it is apparent that no landmarking law is implicated here. Landmarking laws generally permit municipalities to provide "special conditions and restrictions for the protection, enhancement, perpetuation and use of places, districts, sites, buildings, structures, works of art, and other objects having a special character or special historical or aesthetic interest or value." N.Y. Gen. Mun. Law § 96-a. Plaintiffs do not seriously contend that such laws are at issue in this case, nor could they, given the allegations in their complaint.

Nor, the Court holds, can plaintiffs prevail by asserting that the City's exercise of eminent domain constituted the application of a zoning law. See St. John's United Church of

14

Christ v. City of Chicago, 502 F.3d 616, 639-642 (7th Cir. 2007) (holding that RLUIPA, by its own terms, does not apply to eminent domain proceedings); Faith Temple Church v. Town of Brighton, 405 F. Supp. 2d 250, 254-58 (W.D.N.Y. 2005) (same). In New York, municipalities are authorized by statute to enact zoning laws which, generally, "regulate and limit the height, bulk and location of buildings," trades and industries in order "to promote the public health, safety and general welfare." N.Y. Gen. City Law §§ 20(24), 20(25). Such laws are materially different from eminent domain procedures, which allow local governments to assume full ownership of private property for public use, and which derive directly from the New York Constitution. N.Y. Const. Art. I § 7, Art. IX § 1(e); see Faith Temple Church, 405 F. Supp. 2d at 254 (observing that zoning and eminent domain are "two distinct concepts, both of which involve land, but in very different ways"); St. John's United Church, 502 F.3d at 640; East Thirteenth Street Cmty. Ass'n v. New York State Urban Dev. Corp., 84 N.Y.2d 287, 296, 617 N.Y.S.2d 706, 641 N.E.2d 1368 (1994) (recognizing "notable differences between zoning statutes and eminent domain proceedings"). Had Congress wished to bring the distinct, long-standing, well-known, and important governmental power of eminent domain within the ambit of RLUIPA, it surely could have said so. That it did not is compelling. See St. John's United Church, 502 F.3d at 641 ("[g]iven the importance of eminent domain as a governmental power affecting land use, we think that if Congress had wanted to include [it] within RLUIPA, it would have said something. . . . Congress did not mention eminent domain . . . in RLUIPA's definition of a land use regulation, which is enough for us to consider it excluded"); Faith Temple Church, 405 F. Supp. 2d at 254-55. In the absence of statutory direction, the Court declines to extend RLUIPA to include eminent domain proceedings, and thus, to reach the taking of the Warsoff property at issue in this case.[8] Accordingly, even if the Court were to have jurisdiction over the

---

[8] In support of the opposite conclusion -- that RLUIPA *does* encompass eminent domain proceedings --

15

portion of plaintiffs' RLUIPA claim that relates to the taking of the Warsoff property, that claim would be dismissed.

3. **Allegations Regarding the Congregation's SUP**

Plaintiffs also allege that they are entitled to relief under RLUIPA as a consequence of the actions defendants took in response to the Congregation's SUP application, which it filed as part of its plan to build a religious complex on the Warsoff property. Under this RLUIPA theory, plaintiffs argue that defendants violated the statute (1) in April 2001, when DOS sent a letter to BSA objecting to the Congregation's application; (2) in September 2001, when the community board voted to recommend approval of the sanitation garage project; and (3) in December 2001, when CPC finally approved the project. According to plaintiffs, the latter incidents constitute RLUIPA violations vis-à-vis the Congregation's SUP application because it was on one or the both of those dates that the City effectively denied its application.

Assuming, *arguendo*, that some part of the conduct plaintiffs identify could constitute a land use regulation within the meaning of RLUIPA, any claim based upon such conduct is barred by the statute of limitations. It is undisputed that the four-year catch-all federal statute of limitations, codified at 28 U.S.C. § 1658(a), governs claims brought under RLUIPA. Williams v. Gerges, No. 05-CV-2555, 2005 WL 1773857, at *6 (E.D.N.Y. July 26, 2005); United States v. Maui County, 298 F. Supp. 2d 1010, 1012-13 (D. Haw. 2003); see Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004). Consequently, in order for their RLUIPA claim, brought on

---

plaintiffs rely on Cottonwood Christian Ctr. v. Cypress Redevelopment Agency, 218 F. Supp. 2d 1203 (C.D. Cal. 2002). Cottonwood held that the defendant-city's denial of plaintiff's request for a land use permit was a land use regulation under RLUIPA. However, in dicta, the court also noted that even if the only harm suffered by plaintiff had been caused by related condemnation proceedings (which the city had initiated), those proceedings still "would fall under RLUIPA's definition of land use regulation" because that exercise of eminent domain was based on a zoning system developed by the city and "would unquestionably limit or restrict Cottonwood's use or development of land." Id. at 1222 n.9 (internal quotations omitted). Both the Seventh Circuit and the Western District of New York closely analyzed Cottonwood and found its reasoning to be unpersuasive in light of the plain language of RLUIPA. St. John's United Church, 502 F.3d at 641; Faith Temple Church, 405 F. Supp. 2d at 256. For the same reason, this Court finds plaintiffs' reliance on the Cottonwood dicta to be unavailing here.

March 15, 2007, to be timely, plaintiffs must complain of an actionable harm accruing on or after March 15, 2003. But this, they do not and cannot do. The allegedly injurious conduct to which plaintiffs point took place, without exception, in 2001. Likewise, the culmination of that conduct -- City approval of the garage project -- also occurred in 2001: under state law, as recognized by the Second Department in the appeal of the state court proceedings, CPC's approval became final on December 26, 2001. In re Sanitation Garage Brooklyn Districts 3 and 3A, 32 A.D.3d at 1033, 822 N.Y.S.2d at 100; see also In re City of New York, 6 N.Y.3d at 548, 814 N.Y.S.2d at 597, 847 N.E.2d at 1170-71 (CPC decision becomes final, and any harm from it accrues, 20 days after it issues, at the expiration of the City Council call-up period). Thus, inasmuch as plaintiffs argue that the harm from the "effective denial" of their SUP during the ULURP process did not accrue until that process was final, they would have needed to file suit within four years of December 26, 2001 -- a deadline they missed. Finally, the fact that the Congregation voluntarily withdrew its SUP application in February 2002, in response to defendants' actions in the previous year, does not save the claim. Even if the Court were to adopt that date as the time when harm accrued to the Congregation, the RLUIPA claim still would be untimely by more than a year.[9] This avenue of RLUIPA relief therefore is dismissed.

4. **Allegations Regarding the Application and Approval Process for the Sanitation Garage Project**

The story is the same regarding the part of plaintiffs' RLUIPA claim that targets defendants' conduct under article 2 of EDPL and ULURP. Plaintiffs take exception to a number of steps taken by defendants to obtain approval for the garage project, beginning with DOS's June 2000 application for site selection and acquisition of the project site, including the

---

[9] The Congregation's decision to withdraw its SUP application is significant for a different reason, however. Because the Congregation withdrew the application voluntarily, BSA never had occasion to render a decision on it. This pleaded fact disproves the claim that the SUP application was subject to an actual land use determination and provides an additional, independent, and unassailably dispositive ground for the dismissal of this branch of the RLUIPA claim.

environmental review process, the community board's September 10, 2001 hearing and vote, and concluding with CPC's final approval of the project in December 2001. Assuming, again, that one or more of these actions constitutes a land use determination under RLUIPA, plaintiffs have waited too long to seek redress and are now barred by the statute of limitations from doing so. As with the component of their claim relating to the SUP application, the misconduct plaintiffs identify transpired far outside the four-year limitations period prescribed by 28 U.S.C. § 1658(a). Clearly, the alleged harm caused by those offending acts, which accrued on December 26, 2001 when CPC's approval of the garage project became final and binding, took place long before the limitations period began. Accordingly, the remainder of the RLUIPA claim is dismissed.

### C.   The Section 1983 Claim

Plaintiffs also seek recovery under 42 U.S.C. § 1983, alleging that defendants violated their constitutional right to due process by depriving them of adequate notice of two critical events in the ULURP process to acquire the project site. Specifically, plaintiffs assert that defendants failed to provide the Tenants Association with notice of the community board's September 10 hearing and failed to provide any of the plaintiffs notice of CPC's decision not to conduct a site visit -- as plaintiffs allege CPC promised to do -- before formally approving the garage project. Defendants contend, in opposition, that plaintiffs are collaterally estopped from pursuing this claim because the issues it raises were argued by and necessarily decided against plaintiffs in the state court actions.

The Full Faith and Credit Act requires federal courts to give a state court judgment the same preclusive effect that it would receive in the courts of the state in which it was rendered. 28 U.S.C. § 1738; Hoblock, 422 F.3d at 93. Under New York law, collateral estoppel, or issue preclusion, will apply if (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in that proceeding; (3) the party against whom issue preclusion

is asserted had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 146 (2d Cir. 2005); see also Hoblock 422 F.3d at 94.

Plaintiffs' § 1983 claim based on inadequate notice is barred by collateral estoppel. As defendants correctly assert, plaintiffs' notice arguments here are identical to those raised and fully litigated in state court. And there, Supreme Court specifically rejected them, holding that the notice provided by defendants complied with state law and ULURP, In re City of New York, 2004 WL 2590582, at *25-26,[10] and did not violate due process, id. at *36-37. Plaintiffs do not claim that the statutory scheme and notice requirements of EDPL and ULURP are unconstitutional and fail to explain why the state court's rejection of their challenge to the notice actually given by defendants should not be binding in this action. As a result, the § 1983 claim is dismissed.[11]

## III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted. The Clerk is directed to enter judgment for defendants and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
December 8, 2009

ERIC N. VITALIANO
United States District Judge

---

[10] Specifically, Supreme Court held that the City had made a sufficient showing under N.Y. E.D.P.L. § 206(a) to win exemption from the notice and hearing provisions contained in article 2 of EDPL. In lieu of article 2, the City's acquisition process properly was governed by the requirements of ULURP -- requirements, the court concluded, that the City met.

[11] Notwithstanding the foregoing analysis, it appears that the § 1983 claim is deficient for the additional reason that it is untimely. Plaintiffs' alleged constitutional injuries accrued more than three years before they initiated this action, and thus are outside of the prevailing limitations period. See Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002) (in New York, § 1983 claims are subject to a three-year statute of limitations).